## CURTIS v. THE STATE.

1.   CRIMINAL PRACTICE:   *Reading law books to jury.*
     The court may, in its discretion, permit counsel to read law to a jury in a criminal case, but it is its province to determine whether the law proposed to be read is applicable to the facts of the case; and its rulings in the matter are not subject to review unless the discretion is abused to the prejudice of the accused.

2. SAME: *Instructions.*

The circuit court should not instruct the jury as to the law of a particular grade of homicide, when there is no evidence tending to connect the prisoner with it.

APPEAL from *Johnson* Circuit Court.
Hon. S. H. CARTER, Special Judge.

*C. B. Moore, Attorney General,* for appellee:

None of the objections offered to the view of the grounds, have any substantial basis—citing *secs.* 1927 *and* 1928 *Gantt's Digest,* and the case of *Benton v. The State,* 30 *Ark.,* 328. The instructions asked and given on the part of the state were proper. Those refused on the part of defendant, argued on general principles in support of the court.

The court may, in its discretion, refuse to allow law to be read to the jury in criminal cases, "as a part of the argument." See *Winkler v. The State,* 32 *Ark.,* 551.

ENGLISH, C. J. At the October term, 1880, of the circuit court of Johnson county, George W. Curtis was indicted for murder in the first degree; the commencement of the indictment being in Code form, and the body charging that said George W. Curtis, on the fourteenth day of August, 1880, in the county of Johnson, etc., unlawfully, willfully, deliberately, feloniously, of his malice aforethought and with premeditation, did kill and murder one Scott May, then and there being, by then and there shooting him, the said Scott May, with a certain pistol which he, the said George W. Curtis, in his hands then and there held, the same being loaded with gunpowder and leaden bullets, with intent him, the said Scott May, then and un-

lawfully, willfully, deliberately, feloniously, of his malice aforethought and with premeditation, to kill and murder, contrary to the statute, etc., and against the peace, etc.

I. The defendant, on being served with a copy of the indictment, filed a petition for change of venue, on the grounds that the minds of the inhabitants of Johnson county were so prejudiced against him that he could not obtain a fair and impartial trial in said county. To the petition was attached a joint affidavit of himself and Silvia Finch that the facts set forth therein were true to the best of their knowledge and belief.

The prosecuting attorney filed the counter-affidavits of four persons, in which they severally stated, in substance and effect, that they were well acquainted with Silvia Finch; that she was of bad moral character and unworthy of credit as a witness.

Defendant filed no affidavits to sustain her credibility, and the court overruled the motion for change of venue.

The statute requires the application for change of venue to be verified by affidavit, and the truth of the allegations thereof to be supported by the affidavit of *some credible person. Gantt's Digest, sec. 1869.*

It seems that the court below decided, upon the counter-affidavits filed, that Silvia Finch was not a credible person, and we can not undertake to say that she was.

II. After the application for change of venue was overruled, the prisoner demurred to the indictment, on the ground that it did not state facts sufficient to constitute a public offense, and the court overruled the demurrer.

The indictment, in its form and allegations, met the requirements of the Code (*Gantt's Digest, sec. 1796*), and was, in substance, a good common law indictment for murder.

III. The prisoner also filed a motion to quash the indictment, on the ground that the witnesses on whose testi-

mony it was found by the grand jury were not legally sworn. It seems that, on the hearing of this motion, some of the grand jurors were examined as witnesses and their testimony reduced to writing and filed in the form of affidavits, but the court overruled the motion, and there was no bill of exceptions taken at the time to bring these affidavits on to, and make them part of, the record; nor was it done in the general bill of exceptions taken on the overruling of the motion for a new trial, in which no notice was taken of the motion to quash the indictment, or of the decision of the court thereon.

IV. The prisoner was arraigned, pleaded not guilty, the jury found him guilty of murder in the first degree, a motion for a new trial was overruled, bill of exceptions taken, he was sentenced November 5, 1880, to be executed seventh of January, 1881, and prayed an appeal, which was allowed by one of the judges of this court.

The ninth ground of the motion for a new trial was that the verdict was contrary to law and evidence.

The material facts in evidence were that Scott May lived with his father, Isaac May, near a road leading to Clarksville, in Johnson county, and not far from that town; and the house of the prisoner was about seventy yards from the same road, and two hundred and fifty yards from the house of Isaac May, and nearer the town. The fence of Isaac May was not good, and the horse of the prisoner was in the habit of getting into his corn-field at night, which led to a quarrel between him and Scott May. On Friday morning, the thirteenth of August, 1880, the horse having been in the field the two previous nights, the parties met between the two houses, and quarreled, using vulgar epithets, which need not be repeated, and the prisoner drew a pistol on Scott May, and threatened to shoot him. During the same day, the prisoner was seen cleaning and

greasing his pistol, and manifested a spirit of revenge. On the next morning about sun-up, Scott May having made an agreement with Green Griffins to go with him hunting, borrowed a gun for that purpose, but having no ammunition, started to Clarksville, leaving the gun at home, and being unarmed, to get ammunition. After he had passed the house of the prisoner, who seems to have seen him passing, the prisoner got on his horse, followed him at a quick pace, overtook him at about one hundred and seventy-five yards from the house, and shot him, with his pistol, in the side of the neck, the ball ranging down between the neck and the collar bone, and then rode back to his house, pistol in hand. The shot seems to have been instantly mortal; at least Scott May was shortly after found dead in the road. The witnesses agree that he was not armed, though two of the prisoner's witnesses, who claimed to have been near enough to see him, testified that before the prisoner shot him, he put his hand behind him under his coat as if to draw a weapon, but the state attempted to discredit these witnesses. The prisoner, on the same day, stated that he "had killed Scott May deader than hell;" and this appears to be all that he said about it, except that he was going to town to settle the matter.

Omitting minor details, such is the substance of the evidence, and we can not say that it did not warrant the jury in finding the defendant guilty of murder in the first degree.

V. The first, second, third and fourth grounds of the motion for a new trial, relate to the view of the ground, by the jury, where the offense was alleged to have been committed. The view occurred after the witnesses for the state had been examined, and while the witnesses for the defense were being examined. All that the bill of exceptions shows about the view, follows:

"At the close of the testimony of John G. Connelly, a

Curtis v. The State.

witness for the defendant, on the second of November, the prosecuting attorney suggested to the court that the ground being accessible it would be better for the jury to view the ground where the offense is alleged to have been committed, and thereupon the court, without the consent of the defendant, suspended the further examination of witnesses, and ordered the sheriff (who had been previously sworn as to his duty in keeping the jury together, but who was not again sworn as to his duties in keeping the jury together during the view), after having instructed him as to his duties in keeping the jury together during said view, and after having instructed the jury as to their duties during said view, to conduct the jury in a body to the ground to be viewed by them; and the judge of the court, with the sheriff, having in his custody the defendant and the jury, proceeded to the ground, one mile from the court-house, and there the jury, under the direction of the judge, and in the presence of the defendant, were shown the ground to be viewed by them, by the sheriff, and afterwards the jury and defendant were conducted in a body into court, and the trial proceeded. To all of which proceedings by the court and judge, the defendant at the time excepted."

(*a.*) The first objection made to the view, in the motion for a new trial, is, that it was ordered by the court after the state had closed her testimony, and during the introduction of the testimony on the part of the defendant.

The statute does not confine the ordering or making of the view to any particular time in the progress of the trial. *Gantt's Digest, secs. 1927-8.*

Whether the view is necessary, and the time, during the trial, of ordering and conducting it, are within the discretion of the presiding judge. *Benton v. State, 30 Ark., 328.*

(*b.*) The second objection is that the ground to be

viewed was not pointed out to the jury by the court, or by any person appointed to do so, by the court.

The place of the homicide, and its surroundings, had been described to the court and jury, by the witnesses who had been examined, and it appears that the sheriff, under the order of the court, conducted the jury to and showed them the place to be viewed by them.

(c.) The third objection is, that the sheriff was not first sworn as a bailiff, before conducting the jury to make the view.

The sheriff was not only acting under his oath of office, but it appears had been previously specially sworn as to his duties in relation to keeping the jury together, etc., and both he and the jury were instructed by the court as to their duties during the view, before proceeding to make it, and the judge himself accompanied them on the view. Moreover, affidavits of four jurors were filed, showing that during the view they were kept together, and that no person spoke to them on any subject connected with the trial, nor did the sheriff, except to show them the place to be viewed.

(d.) The fourth objection is that but one bailiff accompanied the jury to make the view.

The sheriff was sufficient, unless there had been apprehension that the prisoner might escape during the view, when he might have been placed in charge of one or more sworn officers to prevent escape. *Benton v. State, ubi sup.*

The view seems to have been properly conducted, in the presence of the prisoner, and nothing appears to have occurred to his prejudice. Indeed, the presence of the presiding judge, who found it convenient to accompany the jury on the view, was a safeguard against improper conduct.

VI. The court gave twenty-six instructions moved for

the state, to each and all of which defendant objected, and the giving of them was made the fifth ground of the motion for a new trial.

These instructions are made up of statute provisions relating to the different grades of homicide, and familiar principles of criminal law. There is nothing novel in any of them, and none of them appear to be inapplicable to the evidence. They were fair alike to the state and the prisoner. There is a sweeping objection to each and all of them, even to such as announce the statute definitions of murder in the first and second degrees, voluntary manslaughter, self-defense, etc., and no particular objection is pointed out to any one of them. We deem it useless to lengthen and incumber this opinion by copying them.

VII. The defendant moved eleven instructions, all of which the court refused, and their refusal was made the sixth ground of the motion for a new trial.

The court gave two instructions of its own motion.

All the instructions moved by defendant, except two relating to circumstantial evidence, were sufficiently embraced in those given for the state, and by the court of its own motion; and the two relating to the character and force of circumstantial evidence were inapplicable to the case. If upon the direct evidence there could have been any doubt that defendant shot and killed Scott May, it was removed by his own admission that he had killed him.

VIII. It appears from the bill of exceptions that after the court had instructed the jury, and during the argument, one of the counsel for defendant asked the court to permit him to read to the jury as part of his argument section 1253 of Gantt's Digest, which was refused by the court, and this refusal was made the seventh ground of the motion for a new trial.

Section 1253 of Gantt's Digest defines murder in the

*[margin note:]* 1. CRIMINAL PRACTICE: Reading law to jury.

first degree. The court, in two of the instructions given for the state, the sixth and twentieth, gave in charge to the jury so much of this section as was applicable to the evidence. Thus, in the sixth instruction, the court charged the jury, that: "To constitute the offense of murder in the first degree it must appear that the act of killing was willful, deliberate, malicious and premeditated." And in the twentieth, that: "If you find from the evidence that at any time before the finding of the indictment, in the county of Johnson, etc., the defendant did willfully, deliberately, of malice aforethought and with premeditation, kill Scott May, you will find him guilty of murder in the first degree," etc.

The remainder of the section applies to murder perpetrated by means of poison, or by lying in wait, perpetration of, or in the attempt to perpetrate arson, rape, robbery, burglary or larceny, and had no application to the facts of this case.

The court may in its discretion permit counsel to read law to the jury in a criminal case, but it is its province to determine whether the law proposed to be read is applicable to the facts of the case. The matter of reading law to the jury, as part of the argument, is under the discretion and control of the court, and its rulings in the matter are not subject to review unless its discretion is abused to the prejudice of the accused. *Winkler v. State*, *33 Ark.*, *539*.

IX. It was made the eighth ground of the motion for a new trial that the counsel for defendant proposed to submit to the court, and read other law to the jury, as part of his argument, which was refused, but what law, or how much, is not shown by the bill of exceptions.

X. The tenth and final ground of the motion for a new trial was that the court erred in not instructing the jury as to the degrees of manslaughter.

The court in the instructions given for the state, defined murder in the first and second degrees, voluntary manslaughter and the law of self-defense, but did not define involuntary manslaughter.

There was no feature of the evidence which tended to make the homicide a case of involuntary manslaughter, and hence it was not necessary, or appropriate for the court to instruct the jury as to the law of that grade of homicide. *Benton v. State, 30 Ark., 336.*

After a careful examination of all the questions presented upon the record, and by the bill of exceptions, we find no error to the prejudice of appellant for which the judgment should be reversed.

Affirmed.