## WHITLEY *v.* STATE.

### Opinion delivered September 28, 1914.

1.  TRIAL—RIGHT OF COURT TO ADMONISH JURY TO RETURN VERDICT.—It is not error for the court to admonish the jury of the importance of a case, and to express the hope that they may be able to arrive at a verdict.

2.  TRIAL—ADMONITION TO JURY TO RETURN VERDICT—OPINION OF COURT.— After the jury in a criminal case had deliberated six and a half hours, it is not error for the court to say to them, "There ought to be no difficulty in arriving at a verdict where the evidence is as plain and short as it is in this case," and such language is not an expression of an opinion upon the merits of the case as a whole, or upon any particular fact in evidence.

3.  CRIMINAL LAW—EVIDENCE OF GOOD CHARACTER.—Good reputation prior to the commission of the crime of murder held no defense thereto, and evidence of defendant's good reputation is admissible

only as throwing light upon the question of who was the aggressor.

4. CRIMINAL LAW—GOOD CHARACTER OF DEFENDANT—ARGUMENTATIVE INSTRUCTION.—Where defendant is charged with the crime of murder, instructions that proof of defendant's good reputation and character, if strong enough, would warrant an acquittal, or prove that deceased was the aggressor, are argumentative and are properly refused.

5. CRIMINAL LAW—SCENE OF CRIME—VIEW BY JURY.--Under Kirby's Digest, § § 2379, 2380, it is proper for the court to send the jury to view the scene where it was charged a crime had been committed, solely in the custody of the sheriff, and it was unnecessary to send with the jury some one specially designated to point out the scene of the crime to them, where the scene of the crime and its surroundings had been described by witnesses to the court and jury.

6. CRIMINAL LAW—VIEW BY JURY—OATH BY SHERIFF.—In a homicide trial, where the sheriff had previously taken oath with reference to taking charge of the jury, it is not necessary to administer another oath to the sheriff before he took the jury for a view of the scene of the alleged homicide.

7. TRIAL—CRIMINAL LAW—VIEW BY JURY—DISCRETION OF COURT.—Whenever, in the course of a criminal trial, a view is necessary, the time during the trial for ordering and conducting it are within the discretion of the trial judge.

8. CRIMINAL LAW—VIEW—PRESENCE OF DEFENDANT.—Where the jury is sent to view the scene of an alleged crime at the request of defendant, and defendant fails to accompany them, he will be held to have waived his right to do so.

9. HOMICIDE—EVIDENCE—MOOD OF DECEASED BEFORE KILLING.—Proof that deceased was in a mirthful mood, before he was shot by defendant, when defendant has pleaded self-defense, while irrelevant is not prejudicial.

10. TRIAL—MULTIPLYING INSTRUCTIONS.—The court is not required to multiply instructions on the same issue.

Appeal from Prairie Circuit Court, Northern District; *Eugene Lankford,* Judge; affirmed.

### STATEMENT BY THE COURT.

The appellant was indicted for murder in the first degree, and was convicted of murder in the second degree and sentenced to twenty-one years in the penitentiary for the killing of one Wesley Munn, and has duly prosecuted this appeal.

Jess Whitley and Wesley Munn were rival suitors for the hand of Miss Bessie Baty. The young men and

the young lady mentioned lived in the town of Des Arc. The young men had been assiduous in pressing their respective suits, and the young lady had decided in favor of Munn. This aroused the jealousy of Whitley to an extreme degree.

On Sunday evening prior to the killing, which occurred on Friday, January 2, 1914, Whitley begged Miss Baty to marry him, and she told him that she would not give up Mr. Munn for anybody, whereupon Whitley said "he wished Wesley Munn was in hell; that he could kill him like a chicken." The killing occurred about 9 o'clock in the morning. About two hours before the killing, Whitley purchased a new .38 Colt's double-action pistol. Immediately after the shooting, Whitley was seen going toward his store, and upon being asked what was the matter, said, "I got one long, tall son-of-a-bitch." This was said in his usual tone of voice and he appeared to be calm.

A witness who was in the store when Whitley entered some five or six minutes before the killing occurred, stated that he looked sick and his eyes were red; that she asked him if he was sick; he replied, "No," then drew a pistol and turned around. Witness said to him, "You must be desperate," and he replied, "I am," and turned and walked out of the store and went east.

Whitley and Munn, just before the shooting occurred, were seen standing in front of one Bethel's store, talking. The witness who observed them, stated that at that time neither was making any movements. The witness started down the street, and, on hearing shots fired, turned and looked around and saw defendant shoot at Munn. Munn had his hands drawn up at his elbows, and hallooed in a loud voice, "Oh, My God; he has shot me." During the shooting, Munn was turning from Whitley; Whitley was close to him—about five or six feet from him when the last shot was fired. Munn had one shot in his breast, one in his right side, and two in his left hip. Another witness testified that Munn had six shots; that one entered from the front, one from the side and four from the back.

The testimony of other witnesses tended to show that when they heard the shooting, they looked in that direction and saw one man following another and shooting at him. One witness testified that just before the shooting occurred, he observed Whitley walking along back and forth in front of Bethel's store. Immediately after the shooting, witnesses reached Munn, who was leaning against Bethel's store door, and he had commenced to fall. He fell to the floor and expired in a few moments. Witnesses examined his pockets and found no weapons.

The above are succinctly the facts as they were adduced in behalf of the State.

Witness Bethel testified, over the objection of appellant, that deceased came in witness's store just before the killing, and he and witness were joking just before he left the store and deceased seemed to be in a mirthful mood. Appellant excepted to the testimony as to deceased's frame of mind before the killing.

The defendant, in his own behalf, testified that Miss Baty had told him on the Sunday afternoon before the killing that Munn had said that before she and Whitley should marry, he, Munn, would kill them both; that in the same conversation she said that she cared more for the defendant than any one else she had ever been with. He denied that he had made any statements to the effect that he wished Munn was in hell, or that he could kill him like a chicken. He stated that he did not buy the pistol for the purpose of hunting up Munn and killing him, but for the purpose of protecting himself. Munn would not speak to defendant, and his manner was not friendly toward him. Defendant was a much smaller man than Munn, and had a crippled hand.

Defendant was out collecting bills, and in going to see a party to collect a month's rent, he had to pass by Bethel's store. There he saw Munn. He had, prior to that time, received a letter with Bessie Baty's name signed to it, which he was sure had been written by Munn. He was out in the middle of the sidewalk when Munn came out of Bethel's store. Munn hesitated, and they

faced each other, and defendant asked Munn "what his idea was for fixing up the letter the way he did." Munn replied, "You must be looking for trouble, and right now you will get it, and put his hand to his hip pocket and made a demonstration as though he were going to draw a pistol, and defendant drew his gun and shot him. When he had shot about twice, Munn commenced to move backward and sideways, backing off with his left side to defendant. Defendant advanced four or five steps toward him, and continued shooting. Munn, during the time, kept his right hand back under his coat and defendant looked for him to commence shooting at any time.

Several witnesses testified as to the good reputation of the defendant for peace and quietude.

The above are substantially the facts as they were developed, with much detail, in the testimony that was taken at the trial.

About thirty minutes before the jury returned its verdict, the jury came into court and stated that they had not agreed on a verdict. The court thereupon gave to the jury the following instruction;

"Gentlemen, this is an important case, and I do not want to hurry you, but hope you can arrive at a verdict in this case. There ought to be no difficulty in arriving at a verdict where the evidence is as plain and short as it is in this case; consider it carefully, but report as soon as possible." The defendant objected and excepted to the ruling of the court in giving the instruction. The jury had then been deliberating about six and a half hours.

The court also gave, over the objection of defendant, the following instruction:

"In this case the defendant sets up self-defense as his excuse for the killing. The law does not require him to establish his defense by a preponderance of the evidence, but it is sufficient if the testimony in the whole case raised a reasonable doubt as to whether he acted in necessary self-defense or not." The appellant duly excepted to the ruling of the court.

The court also gave the following instruction:

"There has been some evidence introduced bearing upon the good character of the defendant prior to the killing which you should consider in making up your verdict, but you are instructed that good reputation prior to the commission of the crime is no defense, and the evidence is introduced for the purpose of throwing light upon the question as to who was the probable aggressor; and if you are convinced by the evidence beyond a reasonable doubt that the defendant committed the crime as charged, the fact that his reputation was good prior to that time would be no defense." To the giving of this instruction, the defendant objected and saved his exceptions.

The appellant offered several instructions to the effect that the jury should consider the evidence of the good character of the defendant for peace and quietude, and that such good character, if proved to the satisfaction of the jury, might of itself create such a reasonable doubt in their minds as would justify them in returning a verdict of acquittal, and to the effect that defendant's good character for peace and quietude, when proved, was a strong circumstance to determine who was the probable aggressor, and also to determine whether or not the defendant shot in self-defense. These prayers for instructions were refused, to which appellant duly excepted.

Other instructions fully defining the various degrees of homicide and correctly declaring the law as to self-defense, were given, to which no objection is urged here.

Other facts stated in the opinion.

*J. G. & C. B. Thweatt, F. E. Brown* and *W. A. Leach,* for appellant.

1. When the jury returned into court and stated that they had not agreed upon a verdict, the court erred in stating that "there ought to be no difficulty, etc., where the evidence is as plain and short as it is in this case." It in effect nullified the instructions with reference to a reasonable doubt, by giving the impression that there was

in fact no ground for a reasonable doubt; and, since, if the evidence of defendant's innocence had been plain, it would have been the duty of the court to direct a verdict of acquittal, the jury, in the absence of such direction, were left to the assumption that the court looked upon the evidence of guilt as plain. Const., art. 7, § 23; 60 Ark. 49; 51 Ark. 147; 73 Ark. 573.

2. The court erred in its instruction as to the character of the defendant, in limiting the evidence as to character to the purpose of throwing light on the question as to who was the probable aggressor. It has a broader purpose than that. Character is a substantive fact, to throw light on the defendant's guilt or innocence, to be considered in connection with all the other evidence in the case. 104 Ark. 162-183. See, also, 28 Ark. 164; 34 Ark. 742; Hughes, Instructions to Juries, 785, § 757; 2 Brickwood Sackett, Instructions, § 2480; 5 Enc. of Law, 867; 3 Enc. of Ev. 8; 163 N. Y. 11.

3. It was error to send the jury to view the place of the killing, without accompanying them himself, or sending some one to point it out to them, without permitting the defendant to accompany them, and without administering to the jury the oath required by statute. Kirby's Dig., § § 2379, 2380; 15 Nev. 407; 47 Wash. 243; 30 Ark. 329; Underhill on Crim. Evidence, § 230; 78 Ky. 639; 70 Miss. 755; 22 Nev. 358.

4. Testimony that the deceased was joking and in a mirthful mood one or two minutes before the killing was improperly admitted. The character of the deceased in a homicide case is not relevant unless put in issue by the defendant, and in any event could not be proved by specific acts. Moreover, his frame of mind could not be classed as a part of the *res gestae*. 3 Enc. of Ev., 14; 11 *Id*. 367.

5. The court erred in refusing to instruct the jury as requested in defendant's proposed instruction No. 18, that the law does not require the defendant to establish his claim of self-defense by a preponderance of the evidence, but that it is sufficient if the testimony in the whole

case raises a reasonable doubt as to whether he acted in necessary self-defense or not.  98 Ark. 436; 85 Ark. 359.

*Wm. L. Moose,* Attorney General, and *Jno. P. Streepey,* Assistant, for appellee.

1.  The court's remarks to the jury, when they returned without a verdict, was in no sense an expression of opinion upon the weight of the evidence, but a commendable effort to impress upon them their duty to agree upon a verdict, and was clearly within the discretion and duty of the court.  98 Ark. 83-87.

2.  The instruction as to the character of the defendant was correct.  34 Ark. 743; 44 Ark. 115-122.

3.  There was no error committed in the sending of the jury to view the place of the killing.  Both sides requested it.  They were sent in charge of the sheriff under the same oath given them the night before not to permit any discussion of the case, etc., and the sheriff was also under oath, and instructed by the court to point out the place of the killing.  36 Ark. 284-289.

Appellant did not request leave to accompany the jury, and, therefore, waived that right.  108 Ark. 191.

4.  The testimony as to the deceased being in a mirthful mood shortly before he was killed was not prejudicial.

5.  Appellant's requested instruction 18 was properly refused.  The same ground was covered by instructions given by the court.  100 Ark. 199.

WOOD, J., (after stating the facts).  (1-2.)  It was not error for the court to admonish the jury of the importance of the case and to express the hope that they might be able to arrive at a verdict.  After the jury had deliberated for six and a half hours, it was not error for the court to say to them, "There ought to be no difficulty in arriving at a verdict where the evidence is as plain and short as it is in this case."  The court, by this language, did not express an opinion upon the merits of the case as a whole, or upon any particular fact in evidence.  It was a comment upon the character of the evidence as a

whole, but without any intimation of the opinion of the court·as to whether the evidence tended to show guilt·or innocence.

In *Bishop* v. *State,* 73 Ark. 568, we said: "It is entirely proper for a trial judge, and it is his duty at all stages of the deliberations of the jury, to make plain the obligation resting upon them, if possible, to agree upon a verdict consistent with the facts and the concurring individual convictions of each juror." See, also, *St. Louis, I. M. & S. Ry. Co.* v. *Devaney,* 98 Ark. 83-87, where we said: "The trial judge may properly admonish the jury as to the importance or desirability of their agreeing on a verdict."

The language used by the court in the case at bar was only an expression upon the part of the court of a desire to have the jury return a verdict in the case, but there was no intimation by the court that he was of the opinion that the evidence, as a whole, or any part of it, indicated appellant's guilt.

(3) The court's instruction on the good character of appellant for peace and quietude was in conformity with the law on that subject as announced by this court. See, *Kee* v· *State,* 28 Ark. 164; *Edmonds* v. *State,* 34 Ark. 743; *Rhea* v. *State,* 104 Ark. 162.

The only doubtful issue in the case was as to who was the probable aggressor. According to the testimony for the State, the appellant brought on the fatal rencounter without any provocation whatever. The testimony introduced on the State's behalf tended to show that the appellant armed himself and deliberately sought out Munn and shot him to death because he was a successful suitor for the hand of Miss Baty in marriage. Jealousy, according to the testimony for the State, was the only cause for the unfortunate killing.

On the other hand, according to the testimony of the defendant himself, he approached Munn for an explanation in regard to a letter which he, the appellant, conceived that Munn had dictated or caused to be written, and that thereupon Munn made a demonstration as if to

draw a weapon, when the appellant began shooting him in self-defense.

The only issue, therefore, that was determinative of the guilt or innocence of the accused was as to whether the defendant or the deceased was the aggressor. It was not error, in this state of the case, for the court to tell the jury that the evidence of good reputation prior to the commission of the crime was introduced for the purpose of throwing light upon the question as to who was the probable aggressor.

(4)    Some of the prayers for instructions on behalf of appellant concerning good character told the jury that if good character was shown, it might of itself create such a reasonable doubt as would justify a verdict of acquittal; that "when proved strong enough, it will warrant the jury in believing the defendant innocent;" and, again, that "it is a strong circumstance to determine who was the probable aggressor," and, also, "to determine whether or not defendant shot in self-defense," etc. Instructions in this form were clearly argumentative and expressly told the jury that the effect of the proof of good character would justify them in believing the defendant innocent. These prayers for instructions were an expression of the court on the weight to be given to the evidence on this particular phase of the case, and were erroneous.

So much of the prayers concerning good character as correctly stated the law were covered by the instruction which the court gave.

The testimony of witnesses Horn and Staton tended to corroborate the testimony of the defendant himself to the effect that the deceased, during the shooting, had his hand at his hip pocket. The testimony of witness Austin Flynn tended to show that it was impossible for Horn and Staton to have seen what they claimed, on account of an iron column and other obstructions in their line of vision.

Thereupon, the attorneys for the State and for the defendant requested that the jury be sent to the scene of the killing in charge of the sheriff, and the defendant re-

quested that the court send witnesses Horn and Staton with the jury to the scene of the killing to show or point out to the jury their respective positions at the time the shooting occurred, or else to send some proper person who knew where Horn and Staton claimed to have been at the time of the shooting to so point out their respective positions at the time of the shooting to the jury. The court refused to send either Horn or Staton, or any other person, with the jury to point out the positions of Horn and Staton at the time of the shooting; to which ruling of the court the defendant at the time excepted.

The record shows that the court did not accompany the jury to the scene of the killing, and that he did not appoint any person to accompany the jury other than the sheriff and his deputy, nor did he appoint any person to point out to the jury the scene of the killing. The defendant was not with the jury while they were gone to inspect the scene of the killing, but remained in the custody of the officer. Neither he nor his counsel requested that he be permitted to accompany the jury to the scene of the killing.

Appellant made a request that the court postpone sending the jury to the scene of the killing until after witnesses Horn and Staton were called to the stand to point out on the drawing that had been introduced, and to testify as to their respective positions at the time the shooting was taking place. The court instructed the sheriff to proceed with the jury to the scene of the killing, saying that the above witnesses could be introduced later, and that the jury would be better able to understand the positions as pointed out to them. The appellant duly objected and excepted to the rulings of the court.

We find no error prejudicial to appellant in any of these rulings. The statute provides:

"When, in the opinion of the court, it is necessary that the jury should view the place in which the offense is charged to have been committed, or in which any other material fact occurred, it may order the jury to be conducted in a body, in the custody of proper officers, to the

place, which must be shown to them by the judge or a person appointed by the court for that purpose.

"Such officer must be sworn to suffer no person to speak or communicate with the jury on any subject connected with the trial, nor do so themselves, except the mere showing of the place to be viewed, and return them to the court without unnecessary delay, or at some specified time." Kirby's Digest, § § 2379, 2380.

(5)   The direction by the court to the sheriff to proceed with the jury to the scene of the killing was sufficient to meet the requirements of the statute.   The scene of the killing had been accurately described by the witnesses who had testified before the view was requested, and from the description that had been given of the place where the fatal encounter took place the jury must have been fully apprised of the scene of the killing.   It was therefore unnecessary, under these circumstances, to send some one specially designated to point it out to them.   Besides, the direction of the sheriff to proceed with the jury to the scene of the killing was virtually an instruction to him to point out the scene to the jury.   See, *Benton* v. *State,* 30 Ark. 328-350.

The testimony as to the location of the scene of the killing was not controverted.   Under the evidence, there was no possibility of any mistake being made by the jury when they were directed to view the scene of the killing.

The sheriff and his deputy had been specially sworn in relation to their duties of keeping the jury together during the progress of the trial, and had been instructed not to allow the jurors to communicate among themselves, and they had been specially instructed not to communicate with the jury themselves, nor to allow any one else to do so.

The objections here made to the rulings of the court are well settled adversely to the contention of appellant in *Curtis* v. *State,* 36 Ark. 284-289, where we held as follows:   "The place of the homicide, and its surroundings had been described to the court and jury, by the witnesses who had been examined, and it appears that the sheriff,

under the order of the court, conducted the jury to, and showed them the place to be viewed, by them. The sheriff was not only acting under his oath of office, but it appears had been previously specially sworn as to his duties in relation to keeping the jury together, etc., to their duties during the view, before proceeding to make it.   *   *   *''

(6)    True, no special oath was administered to the sheriff or his deputy on the particular occasion of sending the jury to make a view, but the record shows that the sheriff had the jury in charge the night before ''under proper oath and instructions as to the guarding of the jury,'' and that the court ''instructed the officers that they were under the same oath and instructions about guarding the jury as they were the night before, and not to permit any discussion of the case while they were viewing the scene of the killing, or while they were absent from the court room.''

The requirements of the statute as to the oath to be taken by the officers and instructions to be given them were sufficiently met by the oath which the officers took and the instructions they received, as shown by the record in this case.

(7)    The court did not err in refusing to postpone the sending of the jury to the scene of the killing until witnesses Horn and Staton had testified as to their respective positions at the time the shooting was taking place.   As we said in *Curtis* v. *State, supra,* ''Whether the view is necessary, and the time during the trial of ordering and conducting it are within the discretion of the presiding judge.''

(8)    The record shows that appellant was in court, and that neither the appellant nor his counsel requested that appellant be permitted to accompany the jury while they were gone to view the scene of the killing.   This was a right which appellant had. *Benton* v. *State,* 30 Ark. 328; *Owen* v. *State,* 86 Ark. 317.   But when his attorneys, for him, requested the view, and he and they for him failed to request that he be allowed to be present during

the view, this was tantamount to voluntary absence on his part, and he thereby waived his right. *Davidson* v. *State,* 108 Ark. 191-203; *McVay* v. *State,* 104 Ark. 629. It does not appear from the record that the court, either expressly, or by implication, deprived appellant of his substantive right to be present at the view. The court did not refuse to permit him to be present. In *Benton* v. *State, supra,* the record was sufficient to show a refusal by the court to permit the accused to accompany the jury to the scene of the killing, as held in *Owen* v. *State, supra.*

(9) The court did not err in admitting testimony to the effect that the deceased was joking and in a mirthful mood one or two minutes before the killing. It was not shown that Munn had declared any evil or serious design concerning the appellant on the morning of the killing, much less that he was bent on a mission of murder. On the contrary, the testimony of appellant himself shows that he approached the deceased for the purpose of an explanation of the letter, and that it was then that the deceased resented the inquiry. The proof showing that the deceased was in a mirthful mood two or three minutes before the fatal meeting, which he was not anticipating, although wholly irrelevant, could not have prejudiced the rights of appellant.

(10) The court did not err in refusing to give prayer for instruction No. 18, requested by appellant. The instruction was fully covered by other instructions which the court gave on that subject. The court correctly instructed the jury as to the principles of law embodied in the refused prayer by giving the statute concerning the burden of proving circumstances of mitigation that justified or excused the homicide, etc.

There is no error in the record, and the judgment is affirmed.